# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

| | |
|---|---|
| Donna Corbello, | Case No. 1:07cv985 |
| **Plaintiff,** | Jury |
| vs. | Plaintiff's Complaint for Declaratory Judgment, Equitable Accounting, and Breach of Contract |
| Thomas Gaetano DeVito, | |
| **Defendant.** | |

## COMPLAINT

Plaintiff, Donna Corbello, by her attorney, and for her *Complaint* against the above-named Defendant, hereby alleges as follows:

## THE PARTIES

1.      Plaintiff, Donna Corbello, is an individual, domiciled in Georgetown (Williamson County), Texas.  Plaintiff is the widow and heir of Rex Conrad Woodard, who lived and worked in this District and Division and authored an unpublished, authorized, biographical work regarding Defendant (the "Work"), which was completed in Beaumont, Texas, shortly before his death in 1991.  Plaintiff inherited Mr. Woodard's rights in the Work and is his successor in an agreement with Defendant regarding same.

2.      Defendant, Thomas Gaetano DeVito, is an individual, domiciled in Las Vegas (Clark County), Nevada.  Defendant was an original member of the pop group, the Four Seasons, serving, *inter alia*, as lead guitarist and baritone vocalist, and formed the Variety Trio, the Varietones, and the Four Lovers, its predecessor groups.  Defendant participated with Mr. Woodard in the creation and revision of the Work in this District and Division; entered into an agreement with Mr. Woodard

2

regarding the Work in this District and Division; transacted business with Mr. Woodard and his heirs concerning the Work within this District and Division; and, upon information and belief, has continued to transact business with Texas residents, both generally, and in connection with adaptations of the Work, and/or derivative works based thereon.

## NATURE OF THIS ACTION

3.      This is an action for declaratory judgment, under the *Federal Declaratory Judgment Act* [28 U.S.C. § 2201] and Sections 101 and 201 of the Copyright Act of 1976, as amended [17 U.S.C. §§ 101 and 201], seeking declarations: (a) that the Work authored by Mr. Woodard, to which Defendant contributed facts, direction, and editorial revisions, is a "joint work" within the meaning of 17 U.S.C. § 101; (b) that Mr. Woodard was, at minimum, a co-author of the Work, and a joint owner with Defendant thereof, under 17 U.S.C. § 201(a); (c) that Plaintiff inherited Mr. Woodard's interest in the Work, and is now co-owner with Defendant thereof, under 17 U.S.C. § 201(d); (d) that Defendant has a duty to account to Plaintiff for profits obtained from the use and adaptation of the Work, under 17 U.S.C. §§ 101 and 201(a); (e) that Plaintiff has the right to publish and otherwise exploit the Work, subject to her duty to account to Defendant; and, (f) that U.S. Copyright Reg. No. TXu 454 118 for the Work, which was obtained by Defendant in Defendant's sole name, was secured, and has been held, in trust for Mr. Woodard and Defendant, and must be amended by the Copyright Office to reflect Mr. Woodard's status as co-author and co-claimant, so Plaintiff may record her status as heir and successor to his interests.  This action for declaratory judgment is brought to resolve an actual controversy between the parties, as Defendant now disputes Mr. Woodard's co-authorship of the Work; has registered the copyrights therein in Defendant's name and refuses to amend or supplement the registration; and, has refused to account to Plaintiff, despite

Plaintiff's demands, and notwithstanding the profits and benefits Defendant has derived from, *inter alia*, the use and adaptation of the Work by, or in connection with, the Broadway musical, *Jersey Boys*. This is also an action in equity for an accounting from Defendant of profits obtained from the use and benefit of the Work, and/or works adapted or derived therefrom. Finally, this is an action for breach of contract against Defendant, arising from Defendant's failure to credit Mr. Woodard as co-author of the Work, or to share equally with Plaintiff in revenues arising directly or indirectly therefrom, in violation of an agreement signed by Mr. Woodard and Defendant on or about December 1, 1988.

## JURISDICTION

4.      This Court has jurisdiction over this action, under  28 U.S.C. § 1338(a) [actions arising under Acts of Congress relating to copyrights]; 28 U.S.C. § 1331 [actions arising under the Constitution, laws, or treaties of the U.S.]; 28 U.S.C. § 2201 [the *Federal Declaratory Judgment Act*]; and, 28 U.S.C. § 1367(a) [supplemental jurisdiction over related actions arising under state law]. This Court also has jurisdiction under 28 U.S.C. § 1332(a)(1), in that the parties are citizens of different States, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## VENUE

5.      Venue is proper in this District and Division, under 28 U.S.C. §§ 1400(a) and 1391(b)(2).

## STATEMENT OF FACTS

6.      Plaintiff's husband, Rex Conrad Woodard, was a well-respected member of the Beaumont, Texas legal establishment between 1975 and 1991, and a distinguished journalist with

a national reputation in the field of classic rock and roll music.  Born in Dallas, Texas on April 10, 1950, Mr. Woodard moved to Beaumont in 1975, after obtaining his Juris Doctorate from the Baylor University School of Law and passing the Texas Bar Exam.  He began his legal career as an associate with Sanders & Sanders, and in 1977, founded Woodard and Lindsay, where he practiced law through October 1984.  He established a successful solo trial practice thereafter, and was certified in civil trial law by the Texas Board of Legal Specialization in 1987.  Meanwhile, he met Plaintiff, and the two were married in Beaumont, Texas on May 17, 1986.

7.     Mr. Woodard had been enamored of writing and music from an early age, and his skill with the written word, knack for compelling story-telling, and knowledge of popular music developed into an avocation he hoped ultimately would form a career.  As a child of only four or five years old, he "dictated" elaborate stories of wartime to his mother, who would type them for the entire family to ponder and enjoy.  As he grew older, he wrote stories about baseball to share with friends, and articles concerning coins, and his coin collection.  While in high school, he served on the editorial staff of the yearbook and was a member of the Journalism Club.  During law school, he was Editor of the Student Bar Association's newspaper, and later, while maintaining his full-time law practice, he pursued a secondary career as a freelance writer, publishing articles about boxing, coins, and 1960's popular music – the subject with which he was most engaged.  An avid record collector throughout his life, and a rock trivia buff since the early-1960's, when he would listen to AM radio until dawn with his sister, and compete in music trivia contests on "Sumpin' Else," a Dallas television show, he began writing for *Goldmine Magazine* in the late-1970's, authoring articles about Terry Cashman, lead singer of the Chevrons; Dave Dee, Dozy, Beaky, Mick & Tich, a 1960's German pop group with hit singles in Europe, and others.

8.     Mr. Woodard's best work, however, was reserved for the Four Seasons, who, with lead singer Frankie Valli, writer and keyboard player, Bob Gaudio, lead guitarist, Tommy DeVito (Defendant), bassists Nick Massi and (later) Joe Long, and writer/producer Bob Crewe, were his favorite musical artists.  Mr. Woodard had, *inter alia*, tracked every public development in the Four Seasons' history since purchasing the 45 RPM single, "Candy Girl," at age 13; collected the band's records and maintained a comprehensive discography of its recordings, including rare bootleg recordings and limited edition fan club releases; compiled an extensive collection of rare photographs and newspaper clippings concerning the group, and contributed to a Four Seasons "fanzine" published in the U.K.  Accordingly, he was both enthusiastic and well-prepared when the opportunity arose to write a feature article about the group for *Goldmine Magazine* in 1981.  A copy of this article, entitled, *THE FOUR SEASONS A Lesson in Survival*, as published in August 1981, is attached hereto as *Exhibit 1*.  The article was well-received by fans and rock historians alike, and to date, remains the definitive published history of the Four Seasons' "lost years" –  between 1970, when the group slipped from public consciousness, and 1975, when a reconstituted Four Seasons line-up returned to chart-topping status with the singles, "Who Loves You" and "December 1963 (Oh What a Night)."

9.     Upon information and belief, Mr. Woodard's 1981 *Goldmine* article garnered respect from the Four Seasons Partnership (consisting of Frankie Valli and Bob Gaudio), as well as former group members, Nick Massi and Defendant, and whetted Mr. Woodard's own curiosities concerning the earliest history of the Four Seasons musical group.  Accordingly, shortly following publication of his August 1981 *Goldmine* article, Mr. Woodard conducted extensive research and numerous interviews with early members of the group, in preparation for a second article that would focus

upon the formation of the Four Seasons, and, in particular, its direct predecessor, the Four Lovers, which Defendant led.  On December 9, 1981, in connection with this article, Mr. Woodard interviewed Defendant for the first time, covering a wide range of topics.  A representative excerpt of Mr. Woodard's handwritten notes from this interview is attached hereto as *Exhibit 2*.  On December 23, 1981, he interviewed Defendant's brother, Nick DeVito, who was an early member of the Four Lovers, and its predecessors, the Varietones and Variety Trio, and Defendant was present during this interview, occasionally interjecting his own perspectives.  A sample page from Mr. Woodard's notes concerning his December 23, 1981 interview with Nick DeVito is attached hereto as *Exhibit 3*.  Representative notes from Mr. Woodard's interview with Defendant on that date are attached hereto as *Exhibit 4*.  On January 8, 1982, Mr. Woodard also interviewed Nick Massi – a revolving member of the Four Lovers, Varietones, and Variety Trio, and a founder member of the Four Seasons – who rarely granted interviews.  Representative notes from this interview are attached hereto as *Exhibit 5*.  The resulting article, published in the June 1982 issue of *Goldmine Magazine*, and entitled, *THE FOUR LOVERS Forerunners to the Fabulous Four Seasons*, was, like Mr. Woodard's first, a definitive piece, providing information regarding the group's origins that had not previously been made public, and which is still referenced by rock historians and fans.  A true copy of this article, as published, is attached hereto as *Exhibit 6*.

10.    Mr. Woodard would later observe, with respect to the interviews leading to his 1982 *Goldmine* article, that as an attorney who had taken numerous depositions, he suspected he was not getting "the whole story" from Nick Massi and the DeVito brothers.  Of particular interest to Mr. Woodard were the "gaps" between the real ages of the Four Seasons' members and their "published" ages, which appeared in promotional press releases – a gap of eight years for Defendant and Nick

Massi, and several years for Frankie Valli and early-member Nick DeVito.  Whereas, such discrepancies were not unusual in the entertainment industry, what was intriguing was each member's inability (or unwillingness) to account for his activities during those "missing years." These gaps would be filled five or six years later, when Mr. Woodard would be presented with the scoop of his journalistic career.  Meanwhile, he continued his independent research, and fan-related writing, collecting and news-clipping activities, while keeping in contact with individuals close to the band.

11.     Upon information and belief, Mr. Woodard's writings appeared in a tour program for a Four Seasons line-up performing for audiences in the 1980's, along with photographs from Mr. Woodard's personal collection.   Sometime thereafter, Mr. Woodard received an unexpected telephone call from Defendant, who, while no longer a member of the Four Seasons, had obtained a copy of the program, and marveled at the photographs, some of which he had never seen.  A dialogue ensued, and Defendant informed Mr. Woodard that Defendant had a sensational story to tell, but was not a writer, and wanted Mr. Woodard to tell it.  According to Defendant, Mr. Woodard was selected for the task not only because he was an established writer who was familiar with the Four Seasons (and Defendant's family), but also because he was an attorney, and certain aspects of Defendant's story were so sensitive that he felt it necessary to discuss them with an attorney before making them public.

12.     Mr. Woodard flew to Las Vegas shortly following this conversation, sometime in November 1988, and began a series of intensive interviews with Defendant, during which Defendant shared, for the first time with any journalist, the true story of his unaccounted-for years.  According to Defendant, most of those years, for himself and the other band members – excluding Frankie

Valli and Bob Gaudio – were devoted to various criminal enterprises and long stretches in prison. Moreover, according to Defendant, these experiences led to underworld contacts, some of which continued throughout the Four Seasons' popular era.  These accounts differed radically from the public's perception of the Four Seasons as clean-cut "kids" singing in tuxedos on the *Ed Sullivan Show*, and Mr. Woodard was intrigued.  Mr. Woodard was also excited by the nature of the opportunity offered – not merely a "scoop" for a magazine article, but the opportunity to write Defendant's authorized biography.  Defendant wished to publish his story to the full extent the law would allow.  Yet, Defendant – who had achieved only an eighth grade education – could not write the Work, and wanted Mr. Woodard to do so, with full credit for his efforts, and an equal share in any resulting profits.  The Work was to be based on Mr. Woodard's interviews with Defendant, and any other information or material Mr. Woodard might deem beneficial, subject to Defendant's approval of the final text.  Mr. Woodard agreed to undertake the task, and returned to Beaumont, Texas to begin the process of creating the Work.

13.    Two weeks later, on December 1, 1988, Mr. Woodard sent a letter agreement to Defendant, at Defendant's request, memorializing the parties' understandings regarding the Work, and Defendant signed this document and returned it to Mr. Woodard.  A true copy of the executed letter agreement is attached hereto as *Exhibit 7*.  The key understandings in the document were as follows:  (a) Mr. Woodard would write Defendant's authorized biography, based on the interviews Defendant had given, "plus any other relevant information that would benefit the book;" (b)  Mr. Woodard would "do all of the actual writing;" (c) Defendant would have control over the final text of the Work; (d) Mr. Woodard and Defendant would "be shown as co-authors [of the Work] with [Defendant] receiving first billing;" (e) Mr. Woodard and Defendant would "share equally in any

profits arising from [the Work], whether they be in the form of royalties, advances, adaptations fees, or <u>whatever</u>;" and, (f) the agreement would be binding upon the heirs of both parties, both as to obligations and benefits, if Mr. Woodard, or Defendant, or both, should die. *Exhibit 7* at p. 2 (emphasis added). In sum, the parties intended that the Work be treated as a "joint work."

14. Mr. Woodard labored over the Work for the next two years, drawing upon every shred of knowledge and research he had compiled regarding the Four Seasons over a lifetime in the process, including, *inter alia*, his previous articles for *Goldmine Magazine*; his interviews with Nick Massi and Nick DeVito; his two interviews with Defendant in 1981, and the series of interviews conducted with Defendant in 1988; his extensive collection of newspaper clippings, record albums, fanzines, and photographs; and the various discographies he had compiled. Mr. Woodard also employed tools available to him as an attorney, including the filing of requests under the *Freedom of Information Act* with local law enforcement agencies and the Federal Bureau of Investigation, to obtain Defendant's complete criminal records and confirm alleged U.S. government efforts to link Defendant and/or the Four Seasons to organized crime. Upon information and belief, Mr. Woodard also created a series of questionnaires for Defendant, covering all aspects and phases of Defendant's life, including such minutiae as favorite foods, the layout of Defendant's childhood home, Defendant's first sexual experience, his first wife's hair color, and hundreds of additional factual details, which Defendant provided, often in the form of tape-recorded "notes" which Mr. Woodard's secretary transcribed. Upon information and belief, an additional questionnaire was prepared, and further interviews conducted, following Defendant's 1990 induction into the Rock and Roll Hall of Fame, an event described in the Work. From this material, Mr. Woodard constructed a comprehensive outline of Defendant's life; selected, organized, placed, and phrased the anecdotes,

recollections, and minutiae of Defendant's life he found most compelling, and drafted the entire text

of the Work, based on his perceptions of life through Defendant's eyes, and phrased in a "first-

person" style appropriate to Defendant.

15.     Mr. Woodard remained in close contact with Defendant throughout the drafting of

the Work, by telephone, by mail, and through personal meetings, held at both Defendant's Las

Vegas home, and Plaintiff's and Mr. Woodard's home in Beaumont, Texas, which Defendant visited

with his wife.  As Mr. Woodard completed each chapter of the Work, he sent a copy to Defendant

by mail, and Defendant would contact Mr. Woodard to discuss any desired changes, sometimes

marking such changes to the text in pen, and other times simply requesting that particular facts be

added or removed.  Mr. Woodard would then redraft the subject text and send replacement pages

to Defendant, for retention in a notebook containing the latest version of each page of the Work.

Copies of correspondence between Mr. Woodard and Defendant reflecting this process, as well as

Defendant's cooperation with Mr. Woodard's *Freedom of Information Act* requests, are attached

hereto as *Exhibit 8*.

16.     As the Work neared completion in late-1990, Mr. Woodard began to seek a publisher,

keeping Defendant apprized of his efforts.  Representative correspondence reflecting these efforts

is attached hereto as *Exhibit 9*, and an exemplary report to Defendant is included in *Exhibit 8*, at pp.

8-9.  In connection therewith, Mr. Woodard prepared a condensed, chapter-by-chapter, outline of

the Work for presentation to prospective publishers, a redacted copy of which is included in *Exhibit*

*9*, at pp. 4-5.  Upon information and belief, Defendant also participated in efforts to find a publisher,

discussing at least one possible publishing deal with Mr. Woodard in mid-1989, as shown in *Exhibit*

*8*, at p. 4.  The parties also provided a copy of Mr. Woodard's outline to actor, Joe Pesci, for the

express purpose of adapting the manuscript for a screenplay, as shown in *Exhibit 9*, at p. 3.  At all times during these efforts, it was understood and agreed that, whatever use might be made of the Work, both Mr. Woodard and Defendant would share equally in the resulting profits.

17.     By December 7, 1990, Mr. Woodard was days away from completing the Work, and on December 11, 1990, he wrote Sandy Choron, of March Tenth, Inc. in New York, to solicit her services as his agent in dealings with publishers.  A copy of this letter is attached hereto as *Exhibit 10*.  Therein, Mr. Woodard summarized the history of his involvement with the Work and his role in creating it; described the explosive revelations contained therein, identifying key "scenes" in the Work; discussed the likely impact of these revelations on widespread public perceptions of the Four Seasons; and confirmed that Mr. Woodard had been approached "about doing a screenplay on the project." *Exhibit 10*, at pp. 2-3.  Ultimately, Ms. Choron declined.  However, as represented in the letter shown in *Exhibit 10*, Mr. Woodard completed the Work shortly thereafter, subject only to line editing in final preparation for publication, and Defendant approved the text.  Anticipating that copies of the Work might be disseminated to prospective publishers the following month, Mr. Woodard placed a copyright notice on the title page, in the following form:  "© January, 1991 Tommy Devito, Rex Woodard," with Defendant receiving top billing, as agreed.   A true copy of the cover page of Mr. Woodard's final version of the Work, together with the first page of text, is attached hereto as *Exhibit 11*.

18.     Unfortunately, Mr. Woodard's efforts to secure an agent or publisher were not successful, and, in late-1990, just weeks following his letter to Ms. Choron, his health began to deteriorate.  Although never a smoker, Mr. Woodard had been diagnosed with lung cancer in 1989, and in late-Fall 1990, the cancer spread to his bones.  By December 27, 1990, Mr. Woodard was

visibly ill, having lost significant amounts of weight, and by February or March 1991, he was bedridden.  Mr. Woodard died on May 25, 1991, at forty-one years of age, leaving Plaintiff and three children behind.  A copy of his obituary, as published in the May 27, 1991 edition of the *Beaumont Enterprise*, is attached hereto as *Exhibit 12*.  Whereas, numerous achievements are highlighted therein, the accomplishment of which Mr. Woodard was most proud is summarized as follows:  "In early-1991 [sic], he finished work on his most ambitious project, a full-length book co-authored with Tommy DeVito, a member of the Rock and Roll Hall of Fame."  *Exhibit 12*, at p. 2.

19.     Mr. Woodard's dying wish was that Plaintiff and his sister would ensure that the Work was published after his death.  Mr. Woodard also hoped that income generated by the Work would support his wife and children when he would no longer be there to support them.  In addition to Mr. Woodard's letter agreement with Defendant, through which Plaintiff was the beneficiary of Mr. Woodard's rights and interests in the Work, Mr. Woodard expressly bequeathed to Plaintiff all of his intangible property, "of whatsoever kind and character," as shown in the redacted copy of his *Last Will and Testament*, attached hereto as *Exhibit 13*.

20.     In accordance with Mr. Woodard's last wishes, both Plaintiff and Mr. Woodard's sister, Cindy Woodard Ceen, continued to press for publication of the Work in the years following his death.  Exemplary form letters, which were customized, and sent to prospective publishers by Plaintiff and Mrs. Ceen in 1992, are attached hereto as *Exhibit 14*, along with a listing of publishers to whom Plaintiff sent a copy of Mr. Woodard's outline of the Work.  Unfortunately, public interest in the Four Seasons had waned by this time, and was perceived by publishers to be minimal.  Moreover, neither Plaintiff nor Mrs. Ceen was an attorney, author, or literary agent, with abilities

to market the Work commensurate with those of Mr. Woodard.  Accordingly, the Work remained

unpublished.  Nonetheless, both Plaintiff and Mrs. Ceen continued to seek a publisher independently

of Defendant, and were continuing to do so as of September 2005, when Mrs. Ceen decided to

contact Defendant for possible collaborative assistance.

21.    Specifically, as shown in the documents attached hereto as *Exhibit 15*, in September

2005, Mrs. Ceen informed a member of a Four Seasons fan group that she was trying to reach

Defendant to discuss publication of the Work.  On September 22, 2005, the member responded with

the following message:

> Yesterday I was able to meet with Tommy DeVito.  During the
> course of our conversation, I told him of your desire to publish Rex's
> book and that you were trying to reach him.  He said he loved Rex
> and would [help] in any way he could.  Here is his cell phone
> number:  [redacted].

*Exhibit 15*, at p. 2.  Mrs. Ceen telephoned Defendant that day, and discussed Plaintiff's ongoing

desire to publish the Work.  During this conversation, Defendant was friendly and spoke kindly of

Mr. Woodard; did not deny Mr. Woodard's authorship of the Work; did not deny that Plaintiff had

a right to publish the Work, and did not dispute Plaintiff's ownership interest in the Work.  Rather,

Defendant indicated that he wished to update the Work, to include post-1990 developments.

Defendant also stated that had contemplated "restoring" some of the obscene language he felt Mr.

Woodard had omitted.  Finally, Defendant claimed he had "lost" his copy of the Work, and

requested that Mrs. Ceen send him a replacement copy.  Mrs. Ceen left the conversation excited

about Defendant's statements, because she believed Defendant intended to collaborate with her and

Plaintiff, and she wrote to Defendant the next day, summarizing the conversation, and providing the

requested copy of the Work, as shown in *Exhibit 15*, at p. 3.  Her letter also informed Defendant that

14

Plaintiff was considering self-publishing the Work, if a conventional publisher could not be found. *Id*.

22.     Neither Plaintiff nor Mrs. Ceen heard from Defendant again following the foregoing September 22, 2005 conversation.  However, on November 2, 2005, Mrs. Ceen received a phone-mail message from Jay Julien, who identified himself as Defendant's attorney, and she returned this call on November 3, 2005.  During the ensuing conversation, Mr. Julien advised that he had spoken with Defendant regarding the Work, and concluded that the Work was "not saleable."  Mrs. Ceen was surprised by this comment, because *Jersey Boys* was scheduled to open on Broadway a few days later, and she suggested that the renewed appreciation for the Four Seasons engendered by the play would likely generate an interest in Defendant's story.  Mr. Julien apparently remained unmoved. Nonetheless, he was complimentary of Mr. Woodard, and at no time disputed Mr. Woodard's co-authorship of the Work, Plaintiff's co-ownership thereof, or Plaintiff's right to exploit the Work independently of Defendant, whether "saleable" or not.  Mrs. Ceen sent a letter to Mr. Julien later that day, summarizing their conversation, and asking that Defendant reconsider his position – in view of *Jersey Boys,* Plaintiff believed the optimal time for publication had arrived, and both Plaintiff and Mrs. Ceen felt Defendant's cooperation and endorsement would be beneficial.  Copies of Mrs. Ceen's notes from her conversation with Mr. Julien, and her follow-up letter of November 3, 2005, are included in *Exhibit 15*, at pp. 5-6. Meanwhile, Plaintiff concluded that the burden remained on her to publish the Work, and she continued to hope for a publishing deal.

23.     By the end of 2006, *Jersey Boys* had become a smash hit, and garnered four Tony Awards.  Although Plaintiff had not seen the show, and was unaware of its specific content, Plaintiff surmised that the production's success would give rise to great demand for the Work, and

decided to engage counsel to: (a) confirm that the copyrights in the unpublished Work had been registered by her husband before his death, on behalf of the coauthors/joint owners; (b) register the copyrights on behalf of the coauthors/joint owners, if no application for such registration had been filed; and, (c) determine whether Defendant had changed his mind regarding the marketability of the Work in view of *Jersey Boys'* success, and if so, whether he might again be interested in collaborating with Plaintiff.

24.     Unfortunately, a search of the online database records of the United States Copyright Office conducted by Plaintiff's counsel on or about January 3, 2007, failed to reveal any copyright registration issued to Mr. Woodard for the Work.  However, a search under the keyword, "Tommy DeVito," showed that, on January 11, 1991 – a date on which Mr. Woodard's health was in steep decline – Defendant filed an application, and obtained a copyright registration, for a literary work entitled, *Tommy DeVito – Then and Now*, under Registration No. Txu 454 118.

25.     Whereas, the online database records of the Copyright Office provide little information beyond the title, author, and classification of a work, and Defendant held a number of copyright registrations, Plaintiff could not determine whether the work registered by Defendant under Txu 454 118 was "the Work" at issue herein.  Accordingly, in pursuit of additional information, Plaintiff's counsel ordered a copy of the registration certificate from the Copyright Office, which arrived on or about February 23, 2007.  A true copy of Reg. No. Txu 454 118, as received from the Copyright Office, is attached hereto as *Exhibit 16*.  As shown therein, only Defendant is listed as an "author" of the registered work, and only Defendant is listed as a copyright claimant.  *Exhibit 16*, at p. 2.  The registration also specifies that Defendant wrote the "entire text" of the work; identifies the work as "unpublished," and represents that the work was completed in

1990 – the year Mr. Woodard completed the Work.  *Exhibit 16*, at pp. 2-3.

26.     Whereas, the information contained in Registration No. Txu 454 118 was potentially alarming, the certificate did not include a copy of the material deposited with Defendant's application, so Plaintiff was still unable to determine whether the work registered by Defendant was "the Work."  Moreover, the Regulations and Policies of the Copyright Office do not permit anyone other than the listed copyright claimant to obtain a copy of a deposited work, unless a *Copyright Litigation Statement* (Form LS) is ordered, filed with the Copyright Office, and approved by an attorney in the General Counsel's office.  After careful consideration, and in view of additional emerging facts, discussed hereinbelow, Plaintiff decided to proceed with the ordering and filing of Form LS, to review the work covered by Registration No. Txu 454 118 and ascertain whether it was the Work.  The Form LS was received from the Copyright Office on May 4, 2007, and filed by Plaintiff's counsel on May 6, 2007.

27.     Plaintiff's Form LS was approved by the Copyright Office, and on or about June 8, 2007 Plaintiff finally received a copy of the work deposited with the application leading to Registration No. Txu 454 118.  The deposited work was identical to the Work written by Mr. Woodard as described hereinabove, with one exception – Mr. Woodard's original title page, encaptioned, "UNTITLED TOMMY DEVITO/FOUR SEASONS BIOGRAPHY, and bearing the January 1991 copyright notice in Defendant's and Mr. Woodard's names, had been removed and replaced with a title page reading, "Tommy DeVito – Then and Now By Tommy DeVito."  A true copy of the title page and first page of text from the work covered by Registration No. Txu 454 118 is attached hereto as *Exhibit 17*.  A comparison of this material with that included in *Exhibit 11* shows that the *Prologue* of Mr. Woodard's and Defendant's Work is identical to the *Prologue* in

the unpublished manuscript covered by Registration No. Txu 454 118. All remaining pages of text are also identical. In fact, with the exception of the title page, the work deposited in support of Registration No. Txu 454 118 is a photocopy of the manuscript typed by Mr. Woodard's secretary. The replacement title page, on the other hand, is in a non-matching font, and appears to have been generated by a computer or word-processor. *Exhibit 17*, at p. 2.

28. In view of Mr. Woodard's primary authorship of the Work; the 1988 letter agreement between Mr. Woodard and Defendant; Defendant's awareness of Mr. Woodard's (and his heirs') attempts to publish the Work independently of Defendant; and, the tone and content of Defendant's and Mr. Julien's conversations with Mrs. Ceen, Plaintiff was shocked to learn that Defendant had registered the Work in his own name without disclosure to Mr. Woodard or Plaintiff, and in violation of the parties' letter agreement. Also shocking was the fact that Defendant had filed the underlying application at a time when Mr. Woodard was gravely ill, and not likely focused upon registering the Work, which, after all, had not been published, making such registration optional when Defendant obtained Registration No. Txu 454 118.

29. Unfortunately, this revelation was coupled with near-contemporaneous discoveries that the writers of *Jersey Boys* had obtained access to the Work; that the Work had inspired the form, structure, and content of the musical; that the perspective of the "Tommy DeVito" character therein was derived largely from the Work; that several scenes in *Jersey Boys* were adapted from the Work; that actors portraying Defendant in the production were provided with copies of the Work; and, that Defendant was financially connected to the musical, and had received royalties and/or profits therefrom.

30. Specifically, as shown in the representative articles attached hereto as *Exhibit 18*,

18

a July 8, 2006 *Reuters* report published in *Backstage Magazine* quoted Des McAnuff, director of *Jersey Boys*, as stating that, in creating the script ("libretto"), the writers, Marshall Brickman and Rick Elice, relied on interviews with Bob Gaudio and Frankie Valli, and "an unpublished autobiography by DeVito," *Exhibit 18*, at p. 3 (emphasis added), for the perspectives of their characters in the show, while relying upon others for Nick Massi's side of the story, given his death in December 2000. The main *Wikipedia* article concerning Defendant also reported that: "DeVito has written a lengthy but as-yet-unpublished autobiography (with the help of the late Rex Woodard) about his days with the group, which served, along with other accounts, as background material for the musical." *Exhibit 18*, at p. 4 (emphasis added). A December 23, 2005 *Jersey Boys* "Podcast" included the following "Question and Answer" exchange:

> Q.: Does anyone have any more information about 'THE BOOK' that the *Jersey Boys* Broadway production is based on written by Marshall Brickman and Rick Elice?
>
> A: *Book* is a term that refers to the script, so when they say book by Brickman and Elice they are referring to the script. The writers did reference an unpublished Tommy DeVito autobiography that was provided by Tommy himself. This autobiography was to be, and may still be, published.

*Exhibit 18*, at p. 5 (emphasis added). And, an in-depth interview with Christian Hoff, who first portrayed Defendant in the musical, and won a Tony Award for his performance, yielded further details. According to Mr. Hoff, when casting for Defendant's role began, the script for *Jersey Boys* had not yet been written, and he was provided with a page-and-a-half distillation of the Work from which to audition, *Exhibit 18*, at p. 9, while the entire Work was made available as background research. *Id*. Devon May, who portrays Defendant in a national touring company of *Jersey Boys*, reported similar access to the Work, in an interview for the June 2007 edition of *Backstage*

*Magazine*:

> I've also had the good fortune to read Tommy DeVito's unpublished autobiography.  Hopefully, it will come out sometime soon.  For me, it was really a great educational tool, to get to know who Tommy was.

*Exhibit 18*, at p. 16.  And, other published reports revealed that Defendant was financially connected to *Jersey Boys*, and had received profits or royalties from the production, as shown in the material attached hereto as *Exhibit 19*.  Indeed, Defendant's Web site, housed at <www.tommydevito.com>, referred to Jersey Boys as "his SMASH HIT Broadway play."  *Exhibit 19*, at p. 7 (emphasis added).

31.     Promptly following these discoveries, and within five days of receipt of the material deposited in support of U.S. Copyright Registration No. Txu 454 118, Plaintiff's counsel wrote to Mr. Julien, Defendant's attorney, demanding, *inter alia*, that Defendant execute an application for *Supplementary Registration* under Copyright Form CA to add Mr. Woodard as coauthor and co-claimant of the Work, and provide an accounting of profits derived from the Work, directly or indirectly, in accordance with the parties' agreement, and their status as joint owners of the Work. A copy of this demand, as dispatched to Defendant's counsel on June 13, 2007, by electronic mail and overnight courier, is attached hereto as *Exhibit 20.*

32.     Neither Defendant nor his counsel ever responded in writing to Plaintiff's June 13, 2007 demand.  However, counsel for the parties spoke several times by telephone, and exchanged electronic mail messages, between June and October 2007, in an attempt to reach an amicable resolution.  Over the course of these talks, Defendant's counsel advanced numerous inconsistent factual assertions – initially claiming that Defendant had not shown the Work to anyone, but later admitting that Defendant had provided a copy of the Work to *Jersey Boys*; initially expressing

20

interest in the possibility of pursuing a joint action for copyright infringement against the *Jersey Boys* production, and later stating that Plaintiff's only recourse would be an action against Defendant, as Defendant had authorized the use of the Work by *Jersey Boys*; and, initially claiming Defendant was "considering" executing the Copyright Form CA provided by Plaintiff, which would supplement Registration Txu 454 118 to include Mr. Woodard's copyright claims, and later stating Defendant would not sign the document, because Defendant, rather than Mr. Woodard, was the sole author of the Work.  When questioned about the latter authorship claim, Defendant's counsel stated that Mr. Woodard was merely Defendant's "scribe," and that Defendant had authored the Work However, Defendant's counsel could not explain, among other things, how Defendant could have authored those portions of the Work which were based on Mr. Woodard's independent research; his interviews with third parties, and the material he obtained through *Freedom of Information Act* requests.  Nor could Defendant's counsel explain how Defendant, with only an eighth-grade education, who had repeatedly stated he was "not a writer," would be capable of "dictating" the Work to Mr. Woodard, replete with the dense factual references and literary techniques employed therein.

33.    On July 2, 2007, following the initial talks with Defendant's counsel, Plaintiff's counsel filed an application for *Supplementary Registration* under Copyright Form CA, with the United States Copyright Office, on Plaintiff's behalf, seeking to supplement Registration No. Txu 454 118 to include Mr. Woodard's claims of co-authorship and co-ownership.  A complete copy of this application as filed, including the application form, check, and evidence of filing by overnight courier, is attached hereto as *Exhibit 21*.  The Copyright Office has not yet acted on this application. However, even if granted, the resulting *Supplementary Registration* will not be cross-indexed with

21

Registration No. Txu 454 118, so as to provide clear notice of Mr. Woodard's and Plaintiff's rights, because it was not signed by Defendant, who filed the basic application which Plaintiff seeks to supplement.  Thus, as a result of Defendant's actions, Plaintiff cannot establish or secure clear title to her indivisible joint ownership interest in the Work.

34.     As negotiations with Defendant's counsel concluded unproductively in October 2007, additional facts emerged concerning the connection between *Jersey Boys* and the Work.  First, as shown in *Exhibit 18*, at p. 22, a September 30, 2007 article in the *Chicago Tribune* included the following account of the writing of the musical:

> Drafts passed back and forth.  Faced with the conflicting recollection of the surviving Seasons, Elice and Brickman hit on the politically savvy idea of using all three of them as narrators, each telling their version of the group's history at different points in the show.  *As it happened, DeVito already was writing a memoir, which provided a lot of material*, especially on how the Seasons tap-danced around the Outfit members who controlled many of the venues in which they played, and whose loans underwrote DeVito's lifestyle.

*Id*.  (emphasis added).  Then, in late-October 2007, a book authored by David Cote and entitled, *Jersey Boys The Story of Frankie Valli and the Four Seasons* (the "*Jersey Boys* book"), was published by Broadway Books.  Representative pages of this publication are attached hereto as *Exhibit 22*, and among the one hundred seventy-seven pages thereof are accounts from the director and writers of *Jersey Boys* concerning the evolution of the *Jersey Boys libretto*.  As recounted by director Des McAnuff therein, the initial treatment of *Jersey Boys* was largely fictionalized, and had limited appeal:

> DES McANUFF:  Michael [David] approached me [about *Jersey Boys*] and he was very excited but thought it needed work.  And, quite frankly – and I mean this in no way as an insult to Marshall [Brickman] and Rick [Elice], who've done a spectacular job of

> writing this thing – <u>the initial treatment wasn't of any interest to me. It was fictionalized. There was some biographical information there, but it was largely invention, a traditional musical structure, with people on the street bursting into song, and a bunch of girls as a Greek chorus of Jersey Girls. It didn't grab me. I felt that Nick and Tommy were indistinguishable; the story focused too much on Bob and Frankie and, quite frankly, it sentimentalized them.</u>  It didn't appeal to me . . . . I met with them and heard what they had to say, and then I basically told them that it wasn't for me. Finished lunch, shook hands, thought that would be the end of it.

*Exhibit 22* at p. 3 (emphasis added).  The tide turned, however, in Spring-2004, when the writers and director reviewed the Work, along with two interviews with Frankie Valli and Bob Gaudio, and developed the idea of a biographical production that would be narrated by the members of the Four Seasons, with each providing his personal perspective on the group:

> DES McANUFF:  [T]he really important documents were two long interviews with Frankie and Bob, which were meant to be deep background for a TV movie.  <u>There was also an unpublished autobiography by Tommy DeVito that is beyond description. It was just so delicious. Rick and Marshall had a couple of sequences in their treatment that were clearly inspired by this autobiography.</u>

> MARSHALL BRICKMAN:  <u>We hadn't at that point realized that we wanted to do a biography.</u>  We just didn't want to do a kind of retrofitting of songs to a preconceived plot, like *Mamma Mia!*

*Exhibit 22*, at p. 4.  As the biographical treatment progressed, Defendant's character, "Tommy DeVito," emerged as the opening narrator, the mob-connected "villain," and, in the eyes of many, the star of the show.  As stated in an article from the *Star-Ledger* attached hereto as *Exhibit 23*,  "it is Hoff [the actor playing Defendant], his hair dyed black and slicked back, who struts through the opening scenes, recounting how he plucked Valli from semi-obscurity and shaped an early version of the Four Seasons between stints at what is dubbed 'the Rahway Academy of the Arts.'"  *Exhibit 23*, at p. 3.  Moreover, Defendant's quarter of the show, and other segments, though fictionalized

23

to some extent, were obviously drawn from the Work, and *Jersey Boys* follows the general flow of the Work, beginning with flashback narration from Defendant's character, and continuing to the Four Seasons' induction into the Rock and Roll Hall of Fame, with brief postscripts on the members of the group thereafter.  The most-discussed scenes in *Jersey Boys* are found within the Work, as are its most surprising revelations – revelations that the Work was supposed to first bring to light, including the stories Defendant had believed necessary to run by Mr. Woodard in 1988, before making them public.  In fact, upon information and belief, Mr. Woodard's December 11, 1990 summary of the Work, appearing in the letter shown in *Exhibit 10* at pp. 2-3, would be recognized as a summary of *Jersey Boys* by anyone who has seen the play, despite the fact that it was written fifteen years before the show's Broadway debut.

35.    Upon information and belief, following Plaintiff's June 2007 demands, and the unsuccessful October 2007 negotiations between counsel, Defendant and his attorney commenced a "cover-up," designed to minimize the likelihood that Defendant would be held accountable to Plaintiff for profits derived from the exploitation of the Work in connection with *Jersey Boys*.  First, as recounted in the electronic mail message attached hereto as *Exhibit 24*, written by the author of the *Forward* to the *Jersey Boys* book, Defendant withdrew almost all of his quotes from the book, well after the deadline for publication, to "save them for his forthcoming autobiography," causing a great deal of difficulty for the publisher.  *Exhibit 24*, at p. 2.  Whereas, the use of direct quotations from the Work in the *Jersey Boys* book obviously would have required Defendant to account to Plaintiff for profits, upon information and belief, the subject material was actually removed in an attempt to deprive Plaintiff of royalties and/or an accounting, even though such an accounting was already required, due to the inclusion of an abridged form of the *Jersey Boys libretto* in the *Jersey*

*Boys* book.  Second, in an October 2007 interview for <www.JerseyBoysPodcast.com>, released in December 2007, Defendant claimed, falsely, that he had not shown the Work to anyone – when asked about the role of the Work in the musical, Defendant claimed he had only told stories to the writers and director, notwithstanding the contrary evidence in *Exhibit 18* and *Exhibit 22* hereof. Finally, during the same week in October 2007, Defendant dismantled his Web site, at <www.tommydevito.com>, perhaps hoping that the references to "his SMASH HIT *Jersey Boys*," thereon, would not be noticed and used by Plaintiff.

36.    Upon information and belief, *Jersey Boys* continues to gross over one million dollars per week on Broadway alone, and the production has expanded to include several touring companies, two of which will be performing in Texas during 2008.  Additionally, in the coming year, a "permanent" installation of the show is planned for Las Vegas, Nevada – the result of a multi-million dollar deal – and a touring company for the United Kingdom is planned.  Upon information and belief, additional foreign touring companies are under consideration, and, as shown in the material attached hereto as *Exhibit 25*, a motion picture version of *Jersey Boys* is on the agenda, and a "historic" price is expected for the rights.  *Exhibit 25*, at pp. 2-3.  Upon information and belief, Defendant's profits from the production up to this point have reached seven figures and continue to increase as new touring companies and media outlets are added, and the present value of Defendant's anticipated long-term revenue stream from Jersey Boys likely exceeds ten million ($10,000,000.00) dollars.  Meanwhile, Mr. Woodard, whose writings inspired, and were adapted for the show, was never paid a penny for his efforts, and Plaintiff continues to suffer financially from his early death.  Defendant has a duty to account to Plaintiff, and to pay Plaintiff her full share of those profits attributable directly or indirectly to, *inter alia*, the use and/or adaptation of the Work

for *Jersey Boys*, and upon information and belief, that share exceeds, or will exceed, five million ($5,000,000.00) dollars.   Defendant also must account to Plaintiff for profits attributable to derivative works based upon the Work, as published reports indicate that Defendant has been working with a New York writer to update the Work, or prepare a new work based thereon.  See *e.g.*, *Exhibit 19*, at p. 6.

37.     As a result of Defendant's actual or implicit authorization for the writers and producers of *Jersey Boys* to access, use, reference, and/or adapt the Work, Plaintiff's remedy in the United States as a joint owner thereof, is limited to an action against Defendant for an accounting and payment of profits, and Defendant's refusal to provide the requested accounting deprives Plaintiff of the rights and benefits flowing from her ownership interest in the Work.  Moreover, whereas the copyright laws of other countries differ from U.S. law, in that they require separate licenses from all co-owners of a joint work before the work may be so used or adapted, Defendant lacks authority to authorize unilaterally, the performance of adaptions of the Work in the United Kingdom and/or elsewhere abroad.  To Thus, to the extent that *Jersey Boys* constitutes an adaptation of the Work, in whole or part, it cannot be performed lawfully in the United Kingdom without Plaintiff's express permission.  However, Defendant's registration of the Work in his name, and refusal to supplement the registration to reflect Mr. Woodard's joint authorship, casts a cloud over Plaintiff's title in the Work, preventing her from effectively enforcing these rights abroad.  Finally, Defendant's recent denial of Mr. Woodard's co-authorship, effectively precludes Plaintiff from publishing the Work independently, as Plaintiff cannot provide *prima facie* evidence of joint ownership to prospective publishers, and Defendant will not vouch for her joint ownership of the Work thereto.

38.     Plaintiff has no adequate remedy at law.

## COUNT I

### (Declarations of Copyright Ownership and Defendant's Duty to Account)

39.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through  38 hereinabove, as if fully set forth in this Paragraph 39.

40.     Whereas, Mr. Woodard was the primary author of the Work, Mr. Woodard and Defendant collaborated on the Work between 1988 and 1990, and contributed independently copyrightable content, with the intention that their respective contributions be merged into inseparable or interdependent parts of a unitary whole.

41.     Both Mr. Woodard and Defendant knew and understood that the Work was a "joint work," and intended it to be so, as evidenced, *inter alia*, by their December 1, 1988 letter agreement, and subsequent correspondence.

42.     The Work is a "joint work" within the meaning of Section 101 of the Copyright Act [17 U.S.C. § 101].

43.     Mr. Woodard was a co-author of the Work, and a joint owner of the copyrights with Defendant, holding an indivisible fifty-percent interest therein, under 17 U.S.C. § 201(a).

44.     As joint owner of the Work, Mr. Woodard, during his lifetime, had a right to an accounting from Defendant, for any and all profits obtained as a result of Defendant's exploitation of the Work, under 17 U.S.C. §§ 101 and 201(a).

45.     Upon Mr. Woodard's death on May 25, 1991, Plaintiff inherited his interest in the Work, and is now co-owner thereof with Defendant, under 17 U.S.C. § 201(d).

46.     As a result of Mr. Woodard's death, and Plaintiff's joint ownership of the Work,

Plaintiff has a right to an accounting from Defendant, for any and all profits obtained as a result of Defendant's exploitation of the Work, under 17 U.S.C. §§ 101 and 201.

47.     As joint owner of the Work, Plaintiff has the right to publish and otherwise exploit the Work independently of Defendant in the United States, subject only to her duty to account to Defendant for his share of profits so obtained.

48.     U.S. Copyright Registration No. TXu 454 118, secured by Defendant in Defendant's name, was obtained, and has been held, in trust for Mr. Woodard and Defendant, and must be amended or supplemented by the Copyright Office to reflect Mr. Woodard's status as co-author and original co-claimant, and Plaintiff's status as joint owner of the Work, through succession to Mr. Woodard's interests.

49.     Defendant has wrongfully refused to recognize Mr. Woodard's co-authorship of the Work, and Plaintiff's current co-ownership thereof, intending to appropriate all profits from the exploitation of the Work for himself.

50.     As a result of Defendant's recent, unfounded, allegations that Defendant was the sole author of the Work; as a result of Defendant's registration of the Work in his name only; as a result of Defendant's refusal to supplement the registration to provide notice of Mr. Woodard's co-authorship and Plaintiff's indivisible co-ownership of the Work; and, as a result of Defendant's refusal to account to Plaintiff, notwithstanding Defendant's exploitation and/or licensing of the Work for profit and/or authorization of adaptations or derivative works based thereon, an actual, present, and justiciable controversy exists between Plaintiff and Defendant, as to whether the Work is a "joint work;" whether Mr. Woodard was a co-author and joint owner thereof; whether Plaintiff is now joint owner of the Work, with all rights and obligations attendant to this status; and, whether

Defendant has a duty to account to Plaintiff.

51.     Plaintiff seeks a Declaratory Judgment, pursuant to 28 U.S.C. § 2201, decreeing that the Work is a "joint work" under 17 U.S.C. § 101; that Plaintiff is a joint owner of the Work, under 17 U.S.C. § 201(d), and may exploit the Work independently of Defendant; that Mr. Woodard was a co-author of the Work, and an original co-claimant as to all copyrights therein, under 17 U.S.C. § 201(a); that this contribution and ownership interest must be recognized by the Copyright Office in the context of Registration No. Txu 454 118; and, that Defendant has a duty to account to Plaintiff for all profits arising, directly or indirectly, from Defendant's exploitation of any copyright in the Work, or Defendant's licensure or authorization of others to use, exploit, or adapt the Work, within, or outside, the United States.

## COUNT II

### (Equitable Accounting Under Texas Law)

52.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 51 hereinabove, as if fully set forth in this Paragraph 52.

53.     This Count, arising under the laws of the State of Texas, is for an equitable accounting of profits derived from, or obtained through, Defendant's exploitation of the Work in any manner whatsoever, including, but not limited to, exploitation of the copyrights therein, and for payment of Plaintiff's share of said profits.

54.     By virtue of Plaintiff's status as a joint owner of the Work, Defendant has a continuing fiduciary duty to Plaintiff to account for any and all income derived from the exploitation of the copyrights therein.  This duty requires Defendant to disclose to Plaintiff all income that he has collected from such exploitation, and to pay Plaintiff her fifty-percent share of the profits.

55.     By virtue of the December 1, 1988 letter agreement between Defendant and Mr. Woodard, Defendant has a continuing fiduciary duty to Plaintiff to account for "any profits arising from" the Work, "whether they be in the form of royalties, advances, adaptations fees or whatever" *Exhibit 7*, at p. 2 (emphasis added) – an obligation which extends beyond profits arising only from the exploitation of copyrights, encompassing any profits resulting from the Work.  This duty independently requires that Defendant disclose to Plaintiff all income he has collected as a result of the Work, and pay to Plaintiff her fifty-percent share of the profits.

56.     Plaintiff has demanded that Defendant account for profits arising from the existence of the Work, and from Defendant's direct or indirect exploitation of the copyrights therein, but Defendant has failed and refused, and continues to fail and refuse, to render an accounting or pay Plaintiff her share of the profits.

57.     The precise nature and extent of Defendant's income attributable to the Work are unknown to Plaintiff at the present time, and Defendant's profits cannot be determined without an accounting of Defendant's transactions relating to, *inter alia*, the Work, *Jersey Boys*, the *Jersey Boys* book, the *Jersey Boys* cast recording, which includes portions of the *libretto*, and the motion picture version of *Jersey Boys* which, upon information and belief, is planned.  Moreover, whereas, Defendant may attempt to attribute portions of the profits received to factors other than the Work, the facts and accounts presented are so complex that adequate relief cannot be obtained at law, and an investigation of Defendant's accounts is necessary in order to effect justice between the parties, and establish the value of Plaintiff's interests.

58.     Plaintiff seeks an Order from this Court that Defendant render an accounting to Plaintiff of the amounts owed, as well as a Judgment against Defendant, for a sum to be determined

in the accounting, with prejudgment and post-judgment interest, as allowed by law.

## COUNT III

### (Breach of Contract under Texas Law)

59.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 58 hereinabove, as if fully set forth in this Paragraph 59.

60.     This Count, arising under the common laws of the State of Texas, is for breach of contract.

61.     The December 1, 1988 letter agreement between Mr. Woodard and Defendant attached hereto as *Exhibit 7*, constitutes a valid and enforceable contract, which was not extinguished by Mr. Woodard's death.

62.     Mr. Woodard performed fully under the December 1, 1988 letter agreement, by writing and completing the Work, and according top billing to Defendant on the title page, while showing both parties as co-authors of the Work.

63.     Plaintiff succeeded Mr. Woodard as a party to the December 1, 1988 letter agreement upon his death, and Defendant's obligations and duties to Mr. Woodard thereunder are obligations and duties now owed to Plaintiff.

64.     Defendant has breached the December 1, 1988 letter agreement between the parties by removing Mr. Woodard's name from the title page of the Work; by distributing copies of the Work which do not credit Mr. Woodard as co-author, and by misrepresenting or concealing the nature and extent of Defendant's authorship.

65.     Defendant has breached the December 1, 1988 letter agreement between the parties

by tendering an application for copyright registration with the United States Copyright Office, which failed to credit Mr. Woodard as co-author of the Work, or to list Mr. Woodard as a copyright co-claimant.

66.     Defendant has breached the December 1, 1988 letter agreement between the parties by refusing to share equally with Plaintiff all profits arising from the Work of whatever nature, and by refusing to account to Plaintiff for such profits.

67.     Defendant has breached the December 1, 1988 letter agreement between the parties by permitting others to use and exploit the Work, while actively attempting to conceal this fact from Plaintiff.

68.     Defendant has repudiated the December 1, 1988 letter agreement between the parties by absolutely and unconditionally refusing to perform thereunder, without just excuse.  Plaintiff rejects this repudiation, however, and Defendant remains subject to all obligations of the letter agreement.

69.     Plaintiff has been damaged by Defendant's breaches of contract, beyond the loss of Plaintiff's rightful share of profits thereunder, and Plaintiff is entitled to recover from Defendant, direct damages, as well as foreseeable, consequential damages resulting from Defendant's breaches of contract.  Plaintiff is unable to ascertain, at present, the full extent of the direct and consequential monetary damages Plaintiff has suffered by reason of Defendant's aforesaid breaches of contract, but upon information and belief, if Defendant's conduct continues, Plaintiff will sustain damages in an amount exceeding five million ($5,000,000.00) dollars, and Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff demands:

32

A.      That the Court enter a Declaratory Judgment in favor of Plaintiff, decreeing as follows:

        1.      That the Work authored by Mr. Woodard and Defendant was a "joint work" within the meaning of 17 U.S.C. § 101;

        2.      That Mr. Woodard was a co-author of the Work, and a joint owner of the copyrights therein with Defendant, under 17 U.S.C. § 201(a).

        3.      That Plaintiff inherited Mr. Woodard's interest in the Work upon his death, and is co-owner thereof with Defendant, under 17 U.S.C. § 201(d).

        4.      That Plaintiff, as co-owner of the Work, has the right to publish and exploit the Work independently of Defendant, subject only to her obligation to account to Defendant for profits;

        5.      That Defendant has a duty to account to Plaintiff for all profits arising directly or indirectly from his exploitation of any copyright in the Work, including the issuance of licenses or informal authorizations to third parties, which permit their use, exploitation, or adaptation of the Work, or the preparation of derivative works based thereon; and,

        6.      That U.S. Copyright Registration No. Txu 454 118 has been held by Defendant in trust for Mr. Woodard and Plaintiff, and must be supplemented by the Copyright Office to reflect Mr. Woodard's status as co-author of the Work, and an original co-claimant, as well as Plaintiff's status as heir and successor to Mr. Woodard's interests;

B.      That the Court order Defendant to render an accounting to Plaintiff of the amounts owed under the parties' letter agreement and the Copyright Act;

C.      That Judgment be entered against Defendant for a sum to be determined in the

accounting, together with prejudgment and post-judgment interest, as provided by law;

      D.     That Plaintiff be awarded direct damages, and foreseeable consequential damages, in amounts to be determined through discovery, or at trial, resulting from Defendant's breaches of contract, together with prejudgment and post-judgment interest, as provided by law;

      E.     That Defendant be required to pay to Plaintiff all of Plaintiff's litigation expenses, including reasonable attorneys' fees and the costs of this action; and,

      F.     That the Court provide Plaintiff with such other and further relief as the Court deems just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

RESPECTFULLY SUBMITTED:


December 28, 2007             By :    /s/ Gregory H. Guillot      
                               Gregory H. Guillot
                               Texas State Bar No. 24044312
                               **GREGORY H. GUILLOT, PC**
                               Two Galleria Tower Center
                               13455 Noel Road, Suite 1000
                               Dallas, TX 75240
                               Telephone: (972) 774-4560
                               Facsimile: (214) 515-0411
                               Email:  ggmark@radix.net


ATTORNEY FOR PLAINTIFF, DONNA CORBELLO